UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JESUS TORIVIO-ARIAS,          )
         Petitioner          )
                             )    CIVIL ACTION
         v.                  )    NO. 05-10417-NMG
                             )
UNITED STATES OF AMERICA,    )
         Respondent          )
                             )

**Government's Memorandum In Opposition To
Petitioner's Motion Under 28 U.S.C. §2255**

### Introduction

The United States of America, by Michael J. Sullivan, United States Attorney, and David Hennessy, Assistant U.S. Attorney, for the District of Massachusetts, hereby files this memorandum in opposition to the motion of Jesus Torivio-Arias (hereinafter "Petitioner") under 28 U.S.C. §2255. Petitioner moves to vacate or set aside the sentence this Court imposed, and the underlying conviction, and for an evidentiary hearing, alleging that his attorneys in both the District and Appeals Courts were constitutionally ineffective.

As shown below, the real impetus for this Section 2255 motion is that Petitioner's attempt to defraud the Court and the Criminal Justice System by lying about his true identity and his true criminal history was exposed, and Petitioner received a much higher sentence than what would have been imposed had his fraud not been discovered. Because Petitioner's claims are meritless, and because they can be resolved on the papers, the petition should be

dismissed without a hearing.

**Facts And Prior Proceedings**

**A. Indictment and Plea.**

In November 2000, Petitioner was one of eleven named in a fifteen-count Second Superseding Indictment. Petitioner was charged with one count of conspiring to possess with the intent to distribute, crack cocaine, in violation of 21 U.S.C. §846 (Count 1); and one count of possession of crack cocaine with the intent to distribute it and distribution of it, in violation of 21 U.S.C. §841(a)(1) (Count 11); [PSR ¶5-7].[1]  Petitioner moved to suppress post-arrest statements on January 3, 2001. [D. 121 ].  The motion was denied after a hearing on September 27, 2001. [D. 229-231].

On September 30, 2002, Petitioner pled guilty to both charges without a plea agreement. [Plea Tr. 6].  Before accepting the change of plea, this Court conducted a thorough legal and factual colloquy pursuant to Fed.R.Crim.P. 11 to assure itself that the plea was voluntary and intelligent.  The Court: directed the government to recite the applicable statutory penalties(a maximum of life imprisonment and a mandatory minimum of ten years imprisonment), report that there was no plea agreement, but that, based on available information, that Petitioner gave the government

---

[1] Citations to "[PSR]" refers to the Pre-Sentencing Report; "[D._]" refers to a docket entry; "[Def. Brf.]" refers to the defendant's brief; "[Plea Tr.]" refers to the transcript from the change of plea hearing; and the citation "[Disposition]" refers to the transcript of the sentencing hearing.

a proffer that met the requirement of the safety valve, and asked Petitioner if he was fully satisfied with the advice and representation given to him by his attorney. <u>Id</u>. at 5-7. So thorough was the colloquy that when Petitioner showed confusion when asked whether he was pleading guilty to Count 11 (the substantive drug offense), the Court inquired: "Do you understand you're pleading guilty to Count 11 now, Mr. Arias. Do you understand that?" To which Petitioner answered, "Yes." <u>Id</u>. at 12.

The Court also advised Petitioner that the applicable guideline for his sentence would not be determined until after the completion of a pre-sentence investigation report ("PSR"), and that subject to the PSR and other information, that the Court had the authority to impose a sentence that was more or less severe than that required by the guidelines. <u>Id</u>. at 7-8. Petitioner unequivocally acknowledged that he understood that the Court possessed such authority. Finally, the Court obtained Petitioner's assurance that no promises had been made to induce his plea. <u>Id</u>. 6.

The Court also satisfied itself that there was an independent factual basis for Petitioner's plea. The government proffered that had the case gone to trial, it would have proved that Petitioner, along with his co-defendant Albert Torres, sold crack cocaine to an undercover agent of the Drug Enforcement Agency. <u>Id</u>. at 9-11. On October 28, 1999, the agent contacted Torres on the telephone to set up a purchase for five ounces of crack cocaine. <u>Id</u>. at 9.

3

Torres asked the agent to meet him at a residence at 296 Kimball Street in Fitchburg.  <u>Id</u>.  The agent met Torres outside and then they entered the house.  <u>Id</u>.  Torres entered a back room and returned with Petitioner.  <u>Id</u>.  Petitioner was carrying a package containing beige, cookie-shaped substances.  <u>Id</u>. at 10.  The three men went into a bedroom where Petitioner broke off pieces of the substances so the agent could weigh them.  <u>Id</u>.  The agent asked Torres if he could purchase the crack for $800 an ounce.  <u>Id</u>.  Torres spoke with Petitioner in Spanish and then explained to the agent that the crack was Petitioner's and the lowest Petitioner was willing to sell it for was $850 an ounce.  <u>Id</u>.  The agent asked how much he could get for $4,000 and Petitioner replied through Torres that he could have the five ounces now and could pay the difference later.  <u>Id</u>.  The agent agreed, placed the crack in a bag, and then left.  <u>Id</u>.  The next day the agent returned.  <u>Id</u>.  Petitioner was not there, so the agent paid Torres the remaining $250.  <u>Id</u>.  The DEA lab determined the substances contained cocaine base, with a net weight of 136.9 grams.  <u>Id</u>.  Petitioner did not disagree with or seek to change this proffer.  <u>Id</u>. at 10-11.

The Court accepted the plea.  <u>Id</u>.  When the Court did so, it was the government's belief that Petitioner had no criminal history and was safety-valve eligible.  <u>See</u> <u>Id</u>. at 6.

**B. Petitioner's Obstruction of Justice**

After the plea, it came to light that Petitioner had attempted

4

to defraud the Court: from arrest until publication of the initial PSR, Petitioner falsely represented that he was Jesus Torivio-Arias.  For instance, at his plea hearing under oath and during his post-plea interview with Probation, Petitioner said he was Jesus Torivio-Arias.  Id. at 4.  He even gave Probation false personal and family history, and asserted he was a permanent resident alien. [PSR ¶¶44A, 54].  All of this was a lie – designed to conceal Petitioner's extensive criminal history of narcotics predicates and illegal presence in the U.S.  Petitioner is Miguel Angel Morales Peguero, an illegal alien who had been twice convicted of narcotics felonies.  [Disposition 2,17].  This fact was discovered by Probation during the PSR investigation.  Id. at 10.  Only after Probation exposed the lie, did Petitioner request another meeting with Probation to confess that had concealed his true identity, id. at 4, and give his true name. [PSR ¶44-45].

The reason for the concealment was apparent: while no convictions existed for Jesus Torivio-Arias, under his real name Petitioner had a substantial criminal history, including two prior cocaine distribution convictions and a conviction for escape from prison.  Id. at ¶ 33-35.  Furthermore, the PSR revealed that Petitioner obtained a resident alien card using fraudulent documents, and had been deported from the U.S.  Id. at ¶ 20, 54.

## C. Sentencing

On April 29, 2003, this Court held a sentencing hearing. [D.

5

351]. According to the PSR, Petitioner was responsible for 136.9 grams of crack, the amount he sold to the undercover. [PSR ¶16]. The PSR recommended a two-level upward adjustment for obstruction of justice, yielding an adjusted offense level of 34. [PSR ¶¶23-28]. However, this adjustment was moot. The Court also found that Petitioner, under his true identity, had two felony narcotics convictions, and that coupled with the instant conviction, qualified as a career offender. Accordingly, the base offense level was 37 (based on maximum sentence of life) and his criminal history category was VI under U.S.S.G. §4B1.1(b). [PSR ¶¶29-30, 39; Disposition 17]. According to the PSR, Petitioner's obstruction of justice was incompatible with acceptance of responsibility. The resulting guideline sentencing range was 360 months to life imprisonment. [PSR ¶71].

Notwithstanding a hornbook example of obstruction, Petitioner's attorney advocated for a reduction for acceptance of responsibility. [Disposition 3-6]. While conceding that Petitioner lied about his identity, Counsel argued, under the authority of U.S.S.G. §331.1 that both adjustments might be awarded in "extraordinary cases," that the case was extraordinary because Petitioner had from the time of arrest admitted to committing the crimes charged in the indictment and had proffered with the government. Id. at 5-6.

The government disagreed, arguing that accepting

responsibility for an offense necessarily included admitting one's true identity.  Id. at 7-9.  It also argued that Petitioner moved to suppress his post-arrest admissions and that his offer to cooperate with the government failed because he did not want to plead guilty.  Id. at 7-8.  Finally, the government argued that petitioner's concealment of his identity until after the plea hearing was intended to hide his criminal history and cause the Court to sentence him on incomplete and inaccurate information. Id. at 8-10.  It noted that as a result of the petitioner's deceit, the government lost the opportunity to seek an enhanced sentence based on his criminal record because 21 U.S.C. §851 required notice prior to the guilty plea.

This Court awarded an obstruction of justice enhancement (although it was moot in light of the career offender designation) and denied the acceptance of responsibility adjustment.  It explained that "it does seem to me, however, that an indication of one's acceptance of responsibility for a crime is to admit the identity of the person who committed the crime.  The Court ruled:

> [T]he defendant is not entitled to any
> reduction for acceptance of responsibility
> because, in this Court's opinion, the
> defendant has not accepted responsibility, as
> evidenced by his failure, extreme failure, to
> give truthful answers to the questions asked
> of him by the probation officer after he pled
> guilty.  And, as I understand it, when he was
> confronted even at the second hearing with the
> probation officer about whether or not he had
> ever been deported, he denied that until
> confronted with evidence of the fact that that

7

> occurred.
>
> For those reasons, and as I've said,
> because I do not believe this defendant has
> truly accepted responsibility, he is not
> entitled to any reduction in that regard.

Id. at 11-12.

Counsel still persisted in his advocacy for Petitioner. Counsel had filed a motion for a downward departure based on Career Offender designation overstating criminal history and likelihood of recidivism. At the hearing Counsel supplemented the motion. Id. at 19-20. The Court denied the motion.

Although moot because of the Career Offender designation, this Court also determined, over the objection of Petitioner's Counsel, that the criminal history score should include two points for being under a criminal justice sentence at the time of the commission of the instant offense. [Disposition 14-16].

Under the career offender guideline, the applicable sentencing range was 360 months to life. The Court sentenced Petitioner to 360 months of imprisonment, five years of supervised release, and a $200 assessment. Id. at 21-25.

**D. Appeal.**

Petitioner appealed, claiming that the Court erred in denying him credit for acceptance of responsibility. [D. 356]. On March 15, 2004, the Court affirmed. [D. 386]. The Court held:

> "We find no clear error in the sentencing
> court's refusal to grant a reduction in the
> offense level pursuant to United States
> Sentencing Guidelines Manual 3E1.1, given the

8

significant reduction in Torivio's sentence that would have resulted had he succeeded in withholding his true identity through imposition of sentence".

[D. 386].

## **ARGUMENT**

### *Counsel Effectively Represented Petitioner*

Petitioner claims that he was denied effective assistance of counsel when: (1) his attorney advised him that by his guilty plea he faced a maximum jail sentence of 180 months; (2) his attorney failed to advise him to withdraw his guilty plea; (3) his attorney failed to raise Sixth Amendment objections to Court determinations by a preponderance of guideline and criminal history enhancements; (4) his attorney failed to object to the government's filing of Section 851 notices; and (5) his appellate attorney failed to take up these issues of ineffective assistance on direct appeal. Each of these claims should be denied without a hearing.

We deal briefly and out of order with one claim: that counsel was ineffective for failing to object to the filing of Section 851 notices. Petitioner misstates or misconstrues the record. No Section 851 notices, which would have subjected Petitioner to a mandatory life sentence, were filed in this case. Indeed, precisely because Petitioner succeeded in concealing his true identity and criminal history until after his guilty plea, the government was barred from filing Section 851 notices. Accordingly, this claim should be summarily dismissed. We turn to

9

Petitioner's remaining claims.

**A. Legal Principles**

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Court, in reaffirming that the Sixth Amendment guarantees a criminal defendant "effective" assistance of counsel, said, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Id</u>. at 686. The Court formulated a two-prong test for evaluating counsel's performance. To establish a violation of the Sixth Amendment, a defendant must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome of the proceeding. <u>Id</u>. at 687. In considering such a claim "counsel is <u>strongly presumed</u> to have rendered adequate assistance and made all significant decisions in the exercise of reasonably professional judgment." <u>Id</u>. at 690 (emphasis added). "Courts must 'judge the reasonableness of counsel's challenged conduct on the facts of a particular case, viewed as of the time of counsel's conduct'". <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 477 (2000)(quoting <u>Strickland</u>, 466 U.S. at 690). In the context of a guilty plea, "[i]n order to satisfy the second, or 'prejudice,' requirement, the defendant must show that there is a reasonable probability that, but for counsel's

errors, he would not have pleaded guilty and would have insisted on going to trial". <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).

**B.    Petitioner's claim of ineffective assistance of counsel because his attorney represented that he faced a maximum of 180 months' jail is without merit.**

Petitioner contends that his trial attorney was constitutionally ineffective by advising Petitioner that he faced a maximum of 180 months' imprisonment if he pled guilty, and that as a result, Petitioner's plea, which resulted in a sentence of 360 months' jail, was neither knowing nor voluntary.  [Def. Br. 9]. This claim is without merit.

As an initial matter, it is pellucid that where, as here, a defendant misrepresents critical information to his attorney, counsel cannot be found to have been ineffective in relying on the misrepresentation and advising a defendant based thereon.  As the Court noted in <u>Strickland</u>:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and upon information supplied by the defendant.

466 U.S. at 691; <u>see also</u> <u>United States v. Colon-Torres</u>, 382 F.3d 76, 86 (1st Cir. 2004)("[L]awyers are entitled to rely reasonably on the explicit representations of clients about their criminal histories."; remanding claim of ineffective assistance where record indicated counsel may have learned of prior crimes before plea).

11

Here, assuming Counsel had told Petitioner he faced no more than 180 months in jail,[2] Counsel understandably was acting upon Petitioner's repeated representations, including averments under oath, that he was Jesus Torivio-Arias, for whom there was no known criminal history. Indeed, shortly before the change of plea hearing, both Counsel and the government believed that Petitioner was safety-valve eligible and conducted a proffer so that Petitioner might so qualify. [Disposition at 10]. Accordingly, Counsel's advice, assuming it was given, cannot be considered to have fallen below an objective standard of reasonableness.

Moreover, to his credit, and as an indication of Counsel's competence in representing Petitioner, Counsel made an effort at damage-control. Upon learning of Petitioner's false statements, Counsel promptly requested a second interview with Probation so that Petitioner could admit and correct his false statements. Such a strategy positioned Counsel to better argue for acceptance of responsibility credit or leniency by noting Petitioner had promptly owned up to the lies.

Equally unavailing is Petitioner's claim that because of Counsel's estimate that he faced 15 years in jail, his plea was not knowing and voluntary. The plea shows that Petitioner was advised

---

[2]This is no small assumption since the substance of communications between Petitioner and Counsel is not proved by an affidavit from Petitioner or Counsel, but the say-so of someone who had demonstrated little regard for truth.

12

that he could face up to life imprisonment.  It also shows that Petitioner was expressly advised that the Court would not be able to determine the Guidelines until after the PSR had been prepared and Counsel and the government had an opportunity to challenge it. Id. at 8.  In this regard, the Court expressly advised Petitioner that his sentence could be more or less severe than called for in the guidelines.  Id.  In each instance, Petitioner said he understood.  Finally, the Court secured Petitioner's unambiguous assurance that no promises or assurances of any kind had been made or influenced Petitioner's decision to plead guilty.  Id. at 6. Hence, there is nothing in the record, even assuming Counsel told Petitioner that he faced no more than 15 years, to suggest Petitioner did not knowingly and voluntarily plead to a crime that exposed him to life imprisonment.  Hence, the Section 2255 motion should be dismissed without a hearing.

### C. A Failure to Advise Petitioner to Withdraw his guilty plea at Sentencing Does Not Constitute Ineffective Representation.

Petitioner next claims that his attorney was ineffective because Counsel failed to advise Petitioner, after the PSR was prepared, that he could move to withdraw his plea. [Def. Br. 9-11]. This claim is without merit.

Withdrawal of a guilty plea is not an absolute right.  Fed. R. Crim. P. 11(d) requires defendant seeking to do so to show a "fair and just" reason.  See also United States v. Torres-Rosa, 209 F.3d 4, 8 (1st Cir. 2000).  Upon such a motion, a Court should consider

the totality of the circumstances, and in particular: (i) the plausibility of the proffered reason, (ii) the timing of the attempted retraction, (iii) the presence or absence of a claim of innocence, and (iv) whether the circumstances cast serious doubt on the bona fides of the original plea.  <u>Id</u>. at 8-9.  "The fact that a defendant finds himself faced with a stiffer sentence than he had anticipated is not a fair and just reason for abandoning a plea". <u>Id</u>. at 9.

Assuming *arguendo* that Counsel did not tell Petitioner he could withdraw his plea – again Petitioner offers no affidavits or proof of his communications with Counsel – the likelihood of success of a motion to withdraw his plea was remote, and any failure to advise Petitioner to do so was, under the circumstances, a reasonable strategic choice.  The factors noted above show that such a motion had little chance of success.  First, the proffered reason for seeking withdrawal would have been that Petitioner faced a higher sentence than he expected, a reason caselaw plainly rejects as "fair and just."  Second, the timing of the motion is fatal:  Petitioner would have moved only after his lie about his true identity was revealed.  Third, Petitioner does not contend that he is innocent; nor could he:  Petitioner was face-to-face with an undercover agent in negotiations and delivery of 135 grams of crack.  Lastly, as noted above, there is nothing in the record to cast doubt on the *bona fides* of the original plea.  Rather, the

14

motion would have been predicated on the dubious ground that Petitioner's attempt to defraud the Court had been exposed. Under all these circumstances, Petitioner has suffered no prejudice from the alleged under-performance of counsel because a motion to withdraw under these circumstances was doomed to failure.

But apart from its lack of merit, a motion to withdraw carried extremely significant risks for Petitioner. Foremost, if made and granted, the government would have been able to file the Section 851 enhancements that had been time-barred because Petitioner had been able to conceal his criminal history until after his plea. See 21 U.S.C. §851 (requiring that §851 notice be filed before verdict or plea). As a result, withdrawal would have exposed Petitioner to a mandatory life sentence. This is no small risk because there is every reason to believe Petitioner would have been convicted. The evidence against him included the testimony of the undercover agent who participated in face-to-face negotiations with Petitioner; Petitioner's recorded statements during the transaction (see Ex.1 hereto); and Petitioner's post-arrest statement in which he confessed to participating in the transaction (see Ex. 2 hereto ¶8). Under the circumstances, Counsel's alleged failure to advise Petitioner to move to withdraw his plea was not unreasonable.

For these reasons also, Petitioner's reliance on United States v. Sanchez-Barretto, 93 F.3d 17, 21-23 (1st Cir. 1996), is misplaced. There, in support of a motion to withdraw a guilty

plea, defendant claimed his innocence, and alleged that his attorney's failure to prepare caused counsel to coerce a plea. Here, the unambiguous facts show that whatever advice Counsel provided regarding a plea was skewed by false information Petitioner affirmatively provided. "[T]he fault – if there was one – lies not with what others said but with [Petitioner] himself." Mercedes, 428 F.3d at 360. Under such circumstances, the claim of ineffective assistance should be dismissed without a hearing.

**D.   Petitioner Cannot Show Prejudice from Allegations that Counsel Should have Interposed Apprendi Objections**

Petitioner next contends that Counsel was constitutionally ineffective for failing to object, on the basis of Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004), and United States v. Booker, 543 U.S. 220 (2005), to findings by the Court by a preponderance of the evidence of factors that increased Petitioner's sentence beyond the Guidelines Sentencing Range. ("GSR"). Petitioner identifies the following as objectionable on this theory: Section 851 enhancements; a two-point increase for obstruction of justice; and the assessment of two criminal history points for committing the instant offense while under a criminal justice sentence. This claim is without merit.

There is only one finding by this Court that affected the sentence in this case, and that is that Petitioner is a career offender. This finding had the effect of increasing the BOL to 37 and the criminal history to VI, which prescribe a GSR of 360 months

16

to life.  In light of this determination, findings that Petitioner obstructed justice, or had 10 instead of 8 criminal history points, were academic, and Petitioner suffered no prejudice from such inconsequential findings, assuming *arguendo* the process violated <u>Apprendi</u> and <u>Booker</u>.  Indeed, at the sentencing hearing, such findings were described, or at least recognized, as moot. [Disposition 14, 17-18].

The significance of the foregoing is that the critical finding that determined the sentence here is plainly outside the ambit of <u>Apprendi</u> and <u>Booker</u>.  The rule of <u>Apprendi</u>, as restated in <u>Booker</u> is:  "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt". <u>Booker</u>, 543 U.S. at 244.  Since Petitioner's career offender designation was based on prior convictions, the findings are not objectionable under these cases. <u>United States v. Almendarez-Torres</u>, 523 U.S. 224 (1998)(upholding the authority of judges to determine criminal history); <u>United States v. Ivery</u>, 427 F.3d 69, 75 (1st Cir. 2005)(rationale of <u>Apprendi</u> does not apply to sentence enhancement provisions based on prior convictions).  Hence, it would have been frivolous for Counsel to object to the Court's career offender finding based on <u>Apprendi</u>.  See <u>Polk County v. Dodson</u>, 454 U.S. 312, 323 (1981)("It is the obligation of any

17

lawyer-whether privately retained or publicly appointed-not to clog the courts with frivolous motions or appeals"). The attack on Counsel's performance for failing to raise an <u>Apprendi</u>-like objection should be summarily denied.[3]

### E.  Appellate Counsel's Performance was Reasonable

Petitioner next sets his sights on appellate counsel: that appellate counsel was also ineffective for failing to pursue the issues of ineffective assistance of trial counsel on direct appeal. [Def. Br. 7-8,11,13,15,21].  This claim is without merit.

It is settled that "[f]act-specific claims of ineffective assistance of counsel, not raised below, cannot ordinarily be

---

[3] To the extent Petitioner contends that his attorney should have objected on grounds other than <u>Apprendi</u> to the Court's determination that he had obstructed justice and that he was in violation of his parole, such objections would have been meritless.  The lie to the Court and Probation about identity and history was a text-book example of obstruction.  Perjury serves as a trigger for the obstruction of justice enhancement.  <u>See</u> U.S.S.G. §3C1.1.  The Court properly applied the test for perjury: whether the defendant intentionally gave false information regarding a material matter.  <u>United States v. Campbell</u>, 61 F.3d 976, 984 (1st Cir. 1995).

Similarly, (over his attorney's objection) the Court correctly assessed Petitioner two criminal history points for committing the instant offense within two years of his release from custody.  In pertinent part, he was released in November 1998 from jail in Massachusetts to the custody of INS and then deported from the United States in December of 1998.  Petitioner re-entered the United States illegally and committed the charged offense during October 1999 less than a year after he was released from Massachusetts state custody on the escape charge. The assessment of two points was proper under Section §4A1.1(e).

advanced for the first time on direct appeal, but, rather, must be instigated through a post-conviction petition under 28 U.S.C. § 2255". Mercedes, 428 F.3d at 361.  The rationale behind this rule is that ineffective assistance of counsel claims normally require fact-specific inquiries that an appellate court, without a developed record, is ill-equipped to undertake.  Id.  Exceptions have been made when the "critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration of [the] ineffective assistance claim".  Id. (quoting United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991)).

This case does not fall within the exception.  Petitioner's attack on trial counsel, though entirely unsupported, relies heavily on the substance of his communications with trial counsel, for which there was no record at appeal.  Indeed, the claim is at odds with Petitioner's own application for an evidentiary hearing on this 2255 motion.[4]  Moreover, even if the claims could have been raised on appeal, it is hard to see how Petitioner has been prejudiced by any failure to do so.  His claims of ineffective assistance of counsel are not barred by the failure to raise them in an appeal.  See Strickland, 466 U.S. at 687.  Rather, Petitioner is now receiving a meaningful opportunity to litigate his claims.

---

[4]Nevertheless, no hearing is required here because even assuming that trial counsel provided the advice Petitioner now attacks as falling below an objective standard of reasonableness, the claims, as shown above, are without merit.

Accordingly, the attack on appellate counsel should be summarily dismissed.

## Conclusion

Based on the foregoing, the government respectfully requests that the Court dismiss Petitioner's §2255 motion without a hearing petition since the undisputed facts demonstrate that it is without merit.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


/s/ David Hennessy
By:  David Hennessy
Assistant U.S. Attorney


DATED:    July 10, 2006.

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

> Jesus Torivio-Arias
>
> Inmate No. 80221-038
>
> USP McCreary
>
> P.O. Box 3000
>
> Pine Knot, KY 42635-3000

This 10th day of July, 2006.

**/s/ David Hennessy**
David Hennessy
Assistant U.S. Attorney

DRAFT

| | |
|---|---|
| **Case Name:** | Operation Fitchout |
| **Tape Number:** | N-221 |
| **Date:** | 10/28/99 |
| **Time:** | N/A |
| **Participants:** | Undercover Agent Daryn Johnson (UC1) |
| | Undercover Agent 2 (UC2) |
| | Alex LNU (Alex) |
| | Unidentified Male 1 (UM1) |

**Abbreviations:**

| | |
|---|---|
| (Parentheses) | Translator's notes |
| // Double slashes | Voices overlap |
| <u>Underlined words</u> | Words translated from Spanish |
| ... Three dots | Places of hesitation in conversation |
| (UI) | Inaudible conversation |
| (ph) | Phonetic rendering |



Alex:     (UI) right there, alright? Go show you where my place is at, but the landlord is fixing that.
          I don't want that nigger to know nothing.

UC1:      Okay.

Alex:     You know what I'm saying? (UI) straight.

UC1:      Nice place?

Alex:     No doubt bro', I'm going to show you, you know what I'm saying? Shit just got...

          (Static)

UC1:      (UI)... Where? Where that black truck is. (UI)?

UM1       It's the third (3th) floor... I'm in the third (3rd) floor.

UC1:      So (UI) back here?

Alex:     Me, I should not (UI)... (Static) ...through the front though.

UC1:      But...but the third (3rd) floor.

Alex:     Yeah, the third (3rd) floor you go in, in the front. You see where the black truck is at?

UC1:      Yeah, yeah, yeah.

Alex:     Go to the uhm... front.

UC1:      Okay.

Alex:     'Cause he just...me and my partner. Right here...

UC1:      // What, what Junior?

Alex:     Nah, nah... not Junior. Nah, you could park right here, dog.

UC1:      Park here?

UC2:      (UI)...

Alex:     Yeah, let me go tell my girlfriend to come out real quick, you know what I'm saying?

UC1:      Okay. You gonna meet us here?

                                              2

Alex:          Yeah, yeah real quick.

UC1:           Alright.

Alex:          So we go another, another, another apartment. My girl's apartment, she got a spot right here and shit, another girl that I got.

UC1:           Yeah?

Alex:          (UI) you'll meet her right now.

UC1:           Alright.

Alex:          (Laughs)

UC2:           (Laughs)

UC1:           Is she going to ride with us?

Alex:          Huh?

UC1:           Is she going to ride with us.

Alex:          No, is right there the spot...

UC1:           (UI).

Alex:          // My spot is right here, kid. My girls spot is right here, my spot is right here bro'.

UC1:           // Okay, alright.

Alex:          You got the flavor flav shit, bee.

UC1:           Yeah?

Alex:          I'll be back...

               (Background: Door slams)

| UC1: | Alright. (Background: Dog barks) We are on (UI) Street right now. He lives in the third (3ʳᵈ) floor, up front. Uh...he's going to pick up uncle... he said he is going to his girlfriend's. He's girlfriend is uh...uh...right behind him. Come, come, come talk to me, come talk...(UI). (Background: Radio) (Static) [Aside telephone conversation: Hey, he's going to get the uncle, he's going to get the uncle now. He lives on the uh...third (3th) floor of 296 the front. And his girlfriend lives uh...she lives behind. He's going (UI) to his girlfriend's house (UI) uncle. He's coming back over here now.] |
|---|---|
| UC2: | He's knocking on that window over there. He's parked around here? |
| UC1: | (UI)? |
| Alex: | (UI) would it be alright if (UI) we be right back by (UI). (Static) ...if I don't see the landlord, just in case I see the landlord... (Static) ...three (3) heads. |
| UC1: | Oh yeah. |
| Alex: | You know what I'm saying? |
| UC1: | Okay. |
| Alex: | Alright. |
| UC1: | You know where he is. |
| Alex: | Park back dog... (Static) ...I don't want the landlord (UI). |
| | (Background: Dog barks) |
| UC1: | Is it good right there? |
| Alex: | I'm making sure that nigga (UI). |
| UC1: | Is that what we (UI)? (UI) up there? |
| Alex: | (UI). |
| UC1: | You think (UI) up here? |
| Alex: | Nah...I just (UI). (UI) what's going on bro'? |
| UC1: | Chilling. (UI) you put some weight on? |
| Alex: | Yeah man. |

4

UC1:      Yeah? How's the girl doing?

Alex:     (UI) fucking...

UC1:      // (UI) here, right here.

Alex:     (UI) another chicks.

UC1:      I didn't want to ask.

Alex:     Yeah, (UI).

UC1:      Is she's still pregnant?

Alex:     She (UI). The same way but not (UI)...

UC1:      (UI).

          (Pause)

          (Background: Footsteps)

          (Background: Knocking sounds)

          (Background: Television on)

Alex:     (UI) that's my partner.

UC1:      (UI). (Background: Unintelligible conversation) (Pause) (UI). How you doing man? You
          know, I seen this...

UM1:      Do you know who he is? (¿Tu sabes quien es?) (UI)...

Alex:     (UI).

          (Background: Unintelligible conversation)

UM1:      Do you have, do you have...a (UI)? ¿Tienes, tienes una...una (UI)?

Alex:     That's the only scale I got...

UM1:      Oh, he has one? (Oh, ¿él tiene una?)

Alex:      You got one?

UM1:       Okay, then (entonces).

Alex:      I got the same scale...

UC1:       (UI) dog.

Alex:      How much you need dog?

UC1:       I want five (5).

UM1:       (UI) is twenty (20)...is a hundred (100).

UC1:       Put it right here, I'm (UI).

UM1:       Okay, put it there. (Ponlo ahí.)

UC1:       Tear it?

UM1:       Okay...

UC1:       Tear it?

UM1:       Yeah.

Alex:      // Yeah, go...

UM1:       No, no... (UI).

Alex:      This stalling yo. Damn, it's not like that. If you'd like, do it little by little. (Diablo, no es así, no. Si quieren haganlo poco a poco.) This nigga (UI) down in the ground (UI).

UM1:       (UI) one forty (140) and five (5).

Alex:      You give it to him there. (Déselo usted ahí.)

UC1:       Damn, the Godfather man. I call you the Godfather.

           (Pause)

UM1:       Eighty three (83), alright. (Bueno). (Pause) Fifty seven (57).

Alex:      Fifty seven point four (57.4)...

UM1:  // And, and eighteen (18) and eighty three (83)...

Alex:  Or if you want one...

UM1:  Uh...hundred forty (140)...

UC1:  That's the lowest?

UM1:  ...and five (5).

Alex:  That's about....damn!

UC1:  You eight hundred (800) a piece?

Alex:  What's up?

UC1:  Eight hundred (800) a piece.

Alex:  Eight hundred (800) a piece?

UC1:  That's right.

Alex:  <u>He's asking if you could you give it to him for eight hundred (800) for each ounce.</u> (Dice que si a ochocientos (800) se la puede dejar por cada onza.) The thing is that drug right now...there's no drugs right (UI). Ain't nothing out here.

UM1:  // <u>Tell him, tell him, tell him that...</u> Dile, dile,dile que...

Alex:  The price went up.

UM1:  // <u>Tell him that...that (UI) it's expensive right now.</u> (Dile que ésta...que (UI) porque ésta caro ahora.)

Alex:  // Normally, normally we...normally right now it was going to be, was like for nine (9), nine fifty (950). You got some niggas (UI) right now. For you, cause you're my man, eight fifty (850) kid.

UC1:  Okay, so 1 could get what?

Alex:  How much you got on you though.

UC1:  I got four point five (4.5)...then I get four and half (4½) then.

7

Alex:       Four and half (4½)?

UC1:        Yeah, I got, I got four (4) G's.

Alex:       Four (4) G's?

UC1:        That's only a (UI).

Alex:       Uh...he has four thousand (4,000). So four thousand (4,000),... you have to give it to him
            for,... (Eh...él tiene cuatro mil (4,000). Entonces cuatro mil (4,000)... se lo tiene que dar...)

UM1:        It's four (4), (Son cuatro (4).)

Alex:       Give me here son, let me see what... work things out because if it was mine, you know
            what I mean?

UC1:        I understand, I understand.

UM1:        It's, it's four thousand six hundred and twenty five (4,625), Son, son cuatro mil
            seiscientos veinticinco (4,625). .

Alex:       It's...

UM1:        It's four thousand...

Alex:       It's four thousand six hundred twenty six, (4,626), (Cuatro mil seiscientos veintiséis
            (4,626).)

UM1:        Yes, (Sí.)

Alex:       Like with a five (5) ounce, four (4) G's six hundred and twenty five (4,625) dollars. You
            know what I mean?

UC1:        And what can I get for the four (4) G's?

Alex:       Uh...four thousand (4,000), how much can you give for four thousand (4,000)?
            (Eh...cuatro mil (4,000), ¿cuánto le puede dar por cuatro mil (4,000)?)

UM1:        Uh...hold on, let me see...we have to take out... (Ah...espérate, déjame ver... hay que
            sacar...)

Alex:       // You have to take out... (Hay que sacar...) Do you have a pen there, bro'?  .

UC1:        Yeah.

8

Alex:        He has a pen. (El tiene un lapicero.)

UM1:        We have to take out...We have to take out, hold on let me see... (Hay que sacar... Hay que sacar espérate, déjame ver...)

Alex:        (UI)?

UM1:        At nine (9) and... nine (9) twenty five (25) we have to take out... (A...a nueve (9) y...nueve (9) veinticinco (25) hay que sacar...)

Alex:        (UI) and shit right now (UI). I just want to know (UI)...

UC1:        You just came back from DR?

Alex:        Yeah.

UC2:        You came from DR to New York and...

Alex:        Yeah, from around here...

UC1:        It's a kill now, man.

Alex:        Yeah.

UC1:        And nothing happened to him. (UI)...

UM1:        // Tell him, tell him when is he coming back? (Dile, dile, ¿que cuándo él vuelve?)

Alex:        When, when, when... He comes every week. (El viene semanal.) He said he just wants to know when you are going to come back. I told him you always come weekly.

UC1:        // Yeah, I come often.

UM1:        // Tell him, tell him that I... I'm going to do something, that's what I'm going to give to him on credit. The other six hundred and twenty five (625). (Dile que, dile que yo voy...que voy a hacer algo, que eso es lo que yo le voy a dejar fiao. Los otros, lo otro seiscientos y veinticinco (625).)

Alex:        Alright, he said he's going to give it to you. You pay the six hundred (600) dollars when you...you know what I'm saying?

UM1:        // Okay?

UC1:        // Alright.

9

| | |
|---|---|
| Alex: | // For next week. |
| UC1: | // Alright. |
| | (Pause) |
| Alex: | 'Cause I told him a lot about you, you know what I'm saying? |
| UC1: | Alright. (UI). |
| Alex: | (UI). Let me get it...let me go downstairs and (UI). |
| UC1: | Put there, put it right here. |
| Alex: | <u>Hold it, hold it there let me (UI).</u> (Agárralo, agárralo ahí déjame (UI).) |
| | (Static) |
| UC1: | Each, each one is five hundred (500). |
| UM1: | Yeah, five (5)? |
| UC1: | Five hundred (500)... |
| UM1: | Okay. |
| UC1: | ...a thousand (1,000)... |
| UM1: | Uh-huh. |
| UC1: | ...two thousand (2,000)... |
| UM1: | Yeah. |
| UC2: | ...three thousand (3,000)... |
| UM1: | Yeah, four thousand (4,000). |
| UC1: | // ...four thousand (4,000). |
| UM1: | Okay. |
| UC1: | Count though. |

UM1:    Okay, no problem.

UC1:    I have no problems you counting now.

UM1:    <u>Yes.</u> (Sí.)

UC1:    You speak a little English?

UM1:    Very little, little.

UC1:    Okay, as long as you understand what I'm saying.

UM1:    Okay.

    (Pause)

    (Background: Sound of money being counted)

    (Background: Unintelligible conversation)

Alex:    There you go, dog.

UC1:    Nice and brown man.

    (Static)

Alex:    <u>You count it and you hand it to me so it won't make...if you'd like...</u> (Usted lo cuento y usted me la pasa pa' que no haga...si usted quiere...)

UM1:    // <u>Fine. (UI)...</u> (Está bien, (UI)....)

Alex:    // <u>Is it okay?</u> (¿Está bien?)

UM1:    <u>...I'm going to give it to you in thousands, yeah.</u> (...te lo voy a poner de a mil, sí.)

    (Pause)

Alex:    So yeah, bro', I had... I had to bounce out of that prison kid, (UI) niggas cought my stun gun.

UC1:    Your what?

Alex:    The stun gun, you remember the stun gun I had?

UC1:       Yeah.

Alex:      Yeah, them niggas wanted to lock me up for that shit. So I just bounced...

UC1:       Get out of here.

Alex:      ...I left everything out there. I left everything out there, yo.

UC1:       Yeah, I... I think (UI), He be... he be...

Alex:      // (UI) I left you, ain't no doubt you know how it was kid.

UC1:       (UI).

Alex:      And I snatched it all, all that shit.

UC1:       Did you?

Alex:      (UI) all scratched up, you know what I mean?

UC1:       (UI).

Alex:      It's off the hook there.

UC1:       Might as well, you know, (UI) on the phone and shit. But I don't feel, I feel like it, you know what I mean?

Alex:      Uh-huh.

UC2:       Nah, nah...

UC1:       (UI) my number now, I need to know, you know what I mean?

Alex:      Don't worry about it dog, don't worry about it, you know what I'm saying?
           (Pause)

UC1:       You gotta make sure you count that shit. (UI).

Alex:      Yeah kid, with this nigga right here. I don't know how the different thing (UI). Hey, I know you are going to come next week.

UC1:       Yeah, I'll be here.

Alex:     You've been doing that for what? For three (3) months already, right? Four (4) months...

UC1:      // Yeah, four (4) months kid, four (4) months.

Alex:     Since the first time I came here.

UC1:      That's right.

Alex:     Four (4) months.

          (Pause)

UC1:      It's his, he cooked it?

Alex:     Yeah, he did.

UC1:      Damn...

Alex:     He did it (UI).

UC1:      Damn, nigga got it going on, huh?

Alex:     I helped him out. (Laughs)

UC1:      He got it going on (UI)? He player...

Alex:     // I came out here to get paid and shit.

UC1:      He a player, huh?

Alex:     Yeap, he's been with the games...

UC1:      // And he's the one that goes...

Alex:     ...ten (10) years.

UM2       ...he's the one that goes to DR.

Alex:     Yeah.

UC1:      Come back, pick up his stuff in the middle of something, go back.

Alex:     He bounces.

UC1:        Imagine that shit.

Alex:       He go to all those places. Them little places out there...

UC1:        Upstate New York and shit (UI) talking about...

Alex:       // Yeah, yeah...everywhere, he goes everywhere. Mass...all over Mass. too. You know, (UI).

UC1:        // No shit?

Alex:       Yeah, that's why he came down here.

UC1:        // Yo, yo he...he...

Alex:       // He lives in Boston.

UC1:        He got business here?

Alex:       A couple of pads, yeah.

UC1:        Yeah

Alex:       Every where man. (Laughs)

UC1:        You straight? I see you next week.

UM1:        Okay.

UC1:        Uh...call me (UI) man.

Alex:       (UI).

UM1:        Okay, cool. (Chévere.)

UC1:        // You heard? He, he, he knows name, he knows my name.

UM1:        (UI) crazy. (Loco.) (Laughs) Okay.

UC1:        // (UI).

            (Pause / Static)

            (Background: Unintelligible conversation)

Alex:        (UI).

UC1:        Make sure he knows I am when I come. Can I (UI)...can I (UI) next time (UI). Because you know I don't want (UI)...

Alex:        (UI).

UC1:        Nice little (UI), nice little place here man. Asshole man... (Static) Bathroom, one (1) bedroom... one (1) bedroom...

Alex:        (UI) he ain't here.

UC1:        Is he still here?

Alex:        Yeah, he's taking a shit or something.

UC1:        He stays here, right?

Alex:        Yeah, me and him actually. (Static) (UI).

UC1:        Make sure he knows who I am. I'll see you later man. (Static) He'll know who I am, right? He knows...he saw my face, right? I forgot his face a little. (Static)

Alex:        You want to see him again?

UC1:        I want to see him again (UI). I see him...like (UI). So how long has...how, how, how long he's been here?

Alex:        A little while.

UC1:        A little while? (UI) I could (UI), make sure I see him.
Alex:        No doubt.

        (Pause)

UC1:        Thank you, you take care.

UM1:        Okay.

        (Static)

        (Pause)

15

Alex:      (UI).

UC1:       Alright man.

Alex:      (UI).

UC1:       I gotta (UI)... You know what I'm saying?  (UI)... (Static)    You know, you know...

Alex:      Word up.

UC1:       Nah, nah...I ain't gonna be like that, (UI).

Alex:      (UI) cops and shit.

UC1:       Who cop?

Alex:      One of the detectives is fucking around (UI).

UC1:       // No, no, no (UI)... I've... I've been seeing a cops around here man.

Alex:      Yeah, you gotta watch it (UI). You (UI) slow, you know what I'm saying?

UC1:       I, I don't like (UI). I'm scared that's what it is. This is nice area though.

Alex:      Yeah. (UI), everything is cool. Hey listen, you ever (UI) what I told you?

UC1:       About the (UI)?

Alex:      Yeah.

UC1:       Oh yeah, (UI) good man.
Alex:      It was freaked out. (Laughs) It was freaked out yo.

UC1:       (UI) you know how it is. (UI) you know the guys that live around here?

Alex:      Yeah, yeah (UI)...

UC2:       Nah...nah...(UI)...

Alex:      Nah...nah...don't worry about anything. They'll just call up, "Yo, you know the guy..."
           But don't pay mind, you know how it is. Hey listen, between you and me...

UC1:       // I'll tell you man, what I need is, I (UI) need some shit, you know what I mean? Get me
           something to (UI), but I got them yet.

16

| | |
|---|---|
| Alex: | You need Uzi's and shit like that, right? |
| UC1: | Still son, you know, I'm... I'm not where I want to be. |
| Alex: | Give me... I gotta go to New York with this guy right now. Uh...what's today's day? Today is Wednesday, right? |
| UC1: | Thursday. |
| Alex: | Thursday, no... |
| UC2: | Today is the twenty eighth (28), Thursday. |
| UC1: | // Today is Thursday. |
| UC2: | Thursday, yeah...yeah. |
| Alex: | Thursday, right? |
| UC1: | // You got, you got a day behind homey. |
| Alex: | Damn, Thursday today? |
| UC1: | Yeah., uh... |
| Alex: | Shit. |
| UC2: | // Yeah, tomorrow is Friday. |
| Alex: | Uhm... |
| UC2: | // Just check on it man, let's check on it. |
| UC1: | // ...just check if you could do it. I mean it's not like... |
| Alex: | // Yeah, on Monday. |
| UC1: | // ...I, I'm planning to (UI) some stuff myself but you know, it's hard to come by up here. You know, the kind...the kind I'm looking for, it's hard to come by. |
| UC2: | Just check on it and see. |
| UC1: | Sure, but if you can't...you can't get it, get it... I (UI)...I'm going to be there but it's taking |

a little longer now that you know, (UI)...

| | |
|---|---|
| Alex: | I want to get out of here dog. Is it possible y'all could get a crib over there and start my own shit up there man? |
| UC1: | I'm gonna try, I'm gonna try. |
| Alex: | You know what I'm saying? I want to start my own shit up there cause I can't be here either kid. Cops already know me and everything. Yeah... |
| UC1: | // You hot? |
| UC2: | Yeah man, cause he was over at the other place now they over here. (Laughs) |
| Alex: | I've been moving around. |
| UC2: | Yeah. |
| Alex: | I gotta get around dog. I was at the other place one (1), eight (8), seven (7)...the other place, now, I'm at this place, you know what I'm saying? I gotta get the fuck out. |
| UC1: | // You see, I... I gotta put you somewhere, (UI) draw attention. You see up there, there ain't no fucking Dominicans man. There's not one (1) Dominican (UI). |
| Alex: | No? |
| UC1: | Not one (1). (UI) up there. These are white, white towns, you know what I'm saying? |
| Alex: | // Yeah. |
| UC1: | I got, I gotta find a place for you where you're not going to be...maybe in outskirts somewhere, you know? (UI), a lot of those rents up there...fucking, a one (1) bedroom (UI) like that. (Static) |
| Alex: | On top of that (UI). I got a (UI), I got somewhere that (UI) told me, a chick. It's a White chick. |
| UC1: | It's a White chick? |
| Alex: | It's a White chick that I got. That was the one that...that moves me around and the whole nine yards. |
| UC1: | // Let me meet them, cause I (UI), I don't want for something that's not good for me, you know what I'm saying? |

18

| | |
|---|---|
| Alex: | Nah, they are White chicks. I'm talking about bitches...straight up (UI). |
| UC2: | Yeah. |
| UC1: | // Next time I come, next time I come let me meet them. |
| Alex: | Alright. |
| UC1: | I want, I want just to look at them, meet them. See where they're heads are at. |
| Alex: | Cause I want to move out of here, definitely. |
| UC1: | I understand. |
| Alex: | I want to... I want to... Fucking girl, retarded bitch. |
| UC1: | That's your girl? |

| Alex: | Yeah, I just had a fight with her stupid ass. Fucking women, fuck them, I just want to get mine...I just want to do my thing. Yo Red, I'm telling you man, I got some shit coming through to (UI) right now. Bro', I'm talking about some raw diggidy shit. Some shit ya'll niggas don't have out here. |
|---|---|
| UC1: | What's, what is it? |
| Alex: | Some shit, some fucking powerful (UI), you know? |
| UC2: | Real powder, the real thing. |
| Alex: | The real shit, I'm talking about the real shit. Original... |
| UC2: | // It ain't nothing, it ain't nothing (UI)... |
| Alex: | The original shit, you know what I'm saying? It's, it's not even hard or nothing. It's soft, it's like if you touch it looks like a block, that shit comes down like...you know what I'm saying? It's... |
| UC1: | Word to the mother land, (UI)... |
| Alex: | // Fucking soft, that's what (UI)... You know what I'm saying? It's straight up hard shit son, I'm going to have key. |
| UC1: | When, when, when is it coming in? |
| Alex: | I should be having it by December. This December, like the mid December. I'm talking about, I'm willing to split half of it dog if you get me a...get me a place to be partners. We scoop the shit up, we cook it up, we cook that powder up, we put baking soda, you know? And that's it bro', we make some loot like that. |
| UC1: | Just give me a little time (UI). Let me just go maybe I could find something and hook you up. |
| Alex: | You know what I'm saying? I got somebody that would do it for me, I just don't want to commute up there. If you could give me a little, give me a little holler back. |
| UC1: | Alright, alright, I'll work on that shit. |
| Alex: | Okay? So dog, you take care now. |
| UC1: | // I will alright. |
| Alex: | You too man. |

20

| | |
|---|---|
| UC2: | You too man, you too man. |
| UC1: | No problem, no problem. Take it easy bro'. |
| UC2: | (UI) I got one of those (UI). They are really nice... |
| Alex: | Yeah? |
| UC1: | They are nice, they are nice. |
| Alex: | Yeah, I got a couple of them shit though. |
| UC2: | (Laughs) |
| Alex: | I got two (2) of them shits. |
| UC2: | You be careful out here. |
| Alex: | (UI) baby. |
| UC1: | Take it easy dog. |
| Alex: | Alright. |
| UC1: | Remember, (UI). Alright? |
| Alex: | Take it easy bro'. |
| UC1: | You take it easy. (Static) (Background: Music) Hey man, take your girl to nice dinner dog. Nice dinner, okay? |
| | (Static) |
| | (Pause) |
| | (Background: Unintelligible conversation) |

**End of Conversation**

**U.S. Department of Justice**
**Drug Enforcement Administration**

## REPORT OF INVESTIGATION

Page 1 of 2

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| MET 100 | | | ████████ | GNC3D |

| 5. By: S/A Daniel J. Bull | 6. File Title |
|---|---|
| At Boston, Ma. | ████████████ |

| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | 8. Date Prepared 12/15/99 |
|---|---|

**9. Other Officers:** S/A's  Daryn Johnson, Ed Sarabia, Damon Taylor, Ari Karabinas, Tony Roberto, Lynn P.O. Larry Wentzell, Ken Estes, Geovanni Ruano and Mark Smith.

**10. Report Re:** Arrest of Jesus TORIBIO and Acquisition of Non Drug Exhibit N-257 on 12/14/99.

## DETAILS

1. On December 14, 1999, at approximately 9:00 a.m., the aforementioned officers went to 20 Beaconhill Ave, 1st floor, Lynn, Ma. in an attempt to serve a Federal Arrest Warrant on FNU LNU, AKA The Godfather.  Agents knocked on the door and were granted permission to enter the apartment.

2. Once inside,  S/A Johnson identified one of the occupants as The Godfather.  As a result, the individual was placed under arrest and transported to the Lynn Police Station.

3. The Godfather was subsequently identified as Jesus TORIBIO-ARIAS.  At the Lynn Police station, S/A Bull advised TORIBIO of TORIBIO'S rights per DEA 13A.

4. TORIBIO stated TORIBIO understood TORIBIO'S rights and was willing to answer questions.  With the assitance of Officer Ruano and S/A Roberto, S/A Bull questioned TORIBIO as to the location of fugitives Pasqual INFANTE-MARTE and Manolo PENA-DIAZ.  TORIBIO stated that INFANTE and PENA departed a Fitchburg address 10 minutes prior to a search warrant and thus avoided arrest on 12/9/99.  TORIBIO further stated that INFANTE is in New York awaiting departure from the United States to the Dominican Republic.

5. TORIBIO stated that INFANTE is from Savanah De Mar, Dominican Republic and sends money to a brother with the same last name in La Loma, Puerto Rico.

6. TORIBIO stated that TORIBIO has a source of supply in Boston, Ma., known only as HALI, who can supply kilogram quantities of cocaine.  TORIBIO

| 11. Distribution: Division HQS District SARI Other NII | 12. Signature (Agent)  S/A Daniel J. Bull | 13. Date |
|---|---|---|
| | 14. Approved (Name and Title) Michael J. Pevarnik Group Supervisor | 15. Date |

DEA Form - 6
(Jul. 1996)
DJB

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.



**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. ▮▮▮▮▮▮▮▮▮ | 2. G-DEP Identifier GNC3D |
|---|---|---|
| *(Continuation)* | 3. File Title ▮▮▮▮▮▮▮▮▮ | |

| 4.<br>Page 2 of 2 | |
|---|---|
| 5. Program Code<br>MET 100 | 6. Date Prepared<br>12/15/99 |

---

described HALI as a Dominican male, 5'6" tall, 160-170 lbs, slick black hair, 36-38 yoa and drives a white 92/93 Toyota in Fitchburg, Ma.

7. TORIBIO stated the most TORIBIO purchased from HALI was 300 grams of cocaine. TORIBIO stated TORIBIO would page HALI at # (617) 214-1229. If there was no response to the page TORIBIO would call MOCHEITA, (978) 348-1252, at a residence in Fitchburg and place an order for cocaine. MOCHEITA would then contact HALI.

8. TORIBIO stated TORIBIO did not directly sell S/A Johnson drugs but admitted involvement in the transaction.

## CUSTODY OF EVIDENCE
### NON DRUG EVIDENCE

1. Exhibit N-257 is a wallet containing miscelaneous papers, alien registration card, social security card and a Dominican Passport all bearing the name of Jesus TORIBIO-ARIAS. S/A Johnson seized Exhibit N-257, transported Exhibit N-257 to the New England Field Division and maintained custody until being turned over to the Non Drug Evidence Custodian.

## INDEXING

1. Jesus TORIBIO-ARIAS ▮▮▮▮▮▮▮▮▮ Hispanic male, 5'7" tall, 170 lbs., SSN # 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, Alien Registration # A90 282 035, DOB: 12/25/55, POB: Dominican Republic.

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.